# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
March 27, 2013 Session

## KIMBERLY LOU USELTON ET VIR, TERRY TWAYNE USELTON
v.
## JESSICA WALTON AND CLINTON BRANDON WOODARD

**An Appeal from the Chancery Court for Dickson County**
**No. 2011-CV-484     Larry J. Wallace, Chancellor**

**No. M2012-02333-COA-R3-CV - Filed June 21, 2013**

This is a grandparent visitation case. The biological parents of the child at issue were never married. When the child was born, the father was in the military and away most of the time. The mother permitted the father's parents, the petitioners in this case, to have liberal visitation with the child. As time went on, the mother got married and had children with her new husband. When the subject child was five years old, the mother limited the grandparents' visitation with the child, but she did not end it. Dissatisfied with the limitations, the grandparents filed this petition for court-ordered visitation pursuant to the Grandparent Visitation Statute, Tennessee Code Annotated § 36-6-306. The trial court granted the petition and ordered a visitation schedule that essentially allowed the grandparents to have the father's visitation rights when he was away. The court-ordered schedule even provided for visitation for the grandparents in the event the father chose to exercise all of the visitation to which he was entitled. The mother now appeals. We hold that the trial court erred in essentially placing the paternal grandparents in the stead of the father, and that the Grandparent Visitation Statute is not applicable because there was no proof that the mother opposed the grandparents' visitation before the grandparents filed their petition for court-ordered grandparent visitation. Therefore, we reverse and dismiss the petition with prejudice.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed and the Petition is Dismissed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., joined. ALAN E. HIGHERS, P.J., W.S., filed a dissent.

Irene R. Haude, Nashville, Tennessee, for the Respondent/Appellant, Jessica Warren (Walton)[1]

Shannon L. Crutcher, Nashville, Tennessee, for the Petitioner/Appellees, Kimberly Lou Uselton *et vir*, Terry Twayne Uselton[2]

David D. Wolfe, Dickson, Tennessee, for the Respondent/Appellee, Clinton Brandon Woodard

**OPINION**

**FACTS AND PROCEEDINGS BELOW**

**Background**

In 2005, Respondent/Appellant Jessica Warren (formerly Walton) ("Mother") had a brief romantic relationship with Respondent/Appellee Clinton Brandon Woodard ("Father"), and she became pregnant with his child. Mother lived in Tennessee; Father's domicile was Tennessee, but he was in the military and was stationed elsewhere. In May 2006, while Father was on leave prior to the child's birth, Mother filed a parentage petition in the Dickson County Chancery Court against Father to establish paternity and to adopt a parenting plan for the child.

Later in 2006, while the parentage petition was pending, Mother gave birth to a daughter, Isabella D. W. ("Bella" or "the child"). After testing established Father as the child's biological parent, the chancery court entered an order to that effect. The chancery court acknowledged Mother as the child's primary residential parent, granted Father parenting time when he was home in Tennessee on leave per agreement of the parents, and ordered Father to pay child support.[3] Mother and Father were never married to each other.

When Bella was about four months old, Mother brought her to meet Father at the home of his parents, Petitioner/Appellee Kimberly Uselton, and her husband, Petitioner/Appellee Terry Twayne Uselton (individually, "Grandmother" and "Grandfather;" collectively,

---

[1]Ms. Haude did not represent Respondent/Appellant during the trial court proceedings.

[2]Ms. Crutcher did not represent Petitioner/Appellees during the trial court proceedings.

[3]The chancery court also determined that Father owed Mother a child support arrearage of $2,542.31.

"Grandparents").[4]  It was understood at the time that Father would be absent most of the time because of his military duties.  Mother chose to  permit the Grandparents to develop a relationship with the child.

Grandparents lived less than a mile from Mother and Bella.  When Bella was an infant, Mother brought her for weekly visits with Grandparents.  Initially, Mother stayed with the child during the visits, but she later began leaving the child unsupervised with Grandparents.  This pattern of weekly visits continued until the child was about one year old.

After Bella turned one, Mother permitted Grandparents to have very generous visitation with the child.  In a typical week, the child would visit with Grandparents several times and stay overnight with Grandparents on Saturday night unless the parties made other arrangements.  For Bella's third, fourth, and fifth birthdays, Mother and Grandparents jointly celebrated at Grandparents' home, and the families of both Mother and Grandmother were included in the celebration.  Bella spent time with Grandparents on holidays and even accompanied them on out-of-town vacations.  When the child started school, Mother placed Grandparents on a list of approved visitors at the school, and Grandparents visited her there often.  This pattern of generous visitation continued for several years.

In 2010, Mother married her current husband, Bobby Joe Warren ("Stepfather").  In 2011, after Father finished his five-year stint in the military, he moved to Hawaii with his wife to take a short-term job as an air traffic controller.  Father's intent at that time was to move back to Tennessee after concluding his job in Hawaii.[5]

In the summer of 2011, Father and Mother reached an agreement regarding Father's parenting time while he lived in Hawaii.  On July 25, 2011, the chancery court presiding over the paternity case entered a consent order that incorporated the parents' agreed Parenting Plan.  The agreed Plan allocated Mother 275 days per year of residential parenting time, and allocated Father 90 days per year; but in light of the fact that Father lived in Hawaii, it did not have a definite schedule for Father's residential parenting time except for holidays and vacations.  Instead, the agreed Plan indicated that Mother and Father would cooperate for Father to have  "reasonable and liberal visitation" with the child if he was able to travel to Tennessee.

---

[4]Mr. Uselton is not Father's biological father, but he married Grandmother when Father was a young boy. He has standing to seek visitation under the Grandparent Visitation Statute as "[t]he spouse of a biological grandparent."  *See* Tenn. Code Ann. § 36-6-306(e).

[5]At oral argument in this appeal, counsel for Father appeared and said that Father had, in fact, moved back to Tennessee.

An incident arose in October 2011. At that time, Mother and Stepfather had a one-year-old daughter of their own, and Mother was pregnant with their second (Mother's third) child. The one-year-old daughter fell; she sustained a skull fracture and was taken to the hospital. This prompted an investigation by the Tennessee Department of Children's Services ("DCS").

Pending resolution of its investigation, DCS temporarily removed both the one-year-old daughter and Bella from Mother's care. Initially, both were placed with their maternal grandmother, but Bella became upset, so the maternal grandmother allowed Bella to stay with Grandparents instead. The DCS investigation ultimately resolved with no charges against either Mother or Stepfather.

While Bella was staying at Grandparents' house during the DCS investigation, she was observed playing "girlfriend and boyfriend" with a female playmate. Grandmother told Father about the incident, and Father in turn contacted DCS about it. This matter was subsequently dropped and likewise resulted in no charges against either Mother or Stepfather.

In November 2011, after resolution of the DCS matters, Mother told Grandparents that their previous generous visitation with Bella would have to be more limited, with overnight visits every other Saturday instead of every Saturday. Mother explained that her decision stemmed from her desire for her nuclear family with Stepfather to grow closer, and so Bella would not miss out on family activities every weekend. This decision was not well received by Grandparents.

**Lawsuit**

Dissatisfied with Mother's decision, Grandparents responded by filing the instant lawsuit. On December 13, 2012, Grandparents filed a petition against both Mother and Father in the Chancery Court for Dickson County, Tennessee. The petition sought grandparent visitation pursuant to Tennessee's Grandparent Visitation Statute, Tennessee Code Annotated § 36-6-306. Mother was served with the petition on December 23, 2011, two days before Christmas.

Before Mother was served with Grandparents' lawsuit, Mother and Grandparents had arranged for Bella to visit with Grandparents on Christmas Day from 10:00 a.m. until 3:00 p.m. Despite being served with a lawsuit, Mother did not cancel the scheduled Christmas visit; Bella was permitted to visit with Grandparents as previously arranged. When the parties met, however, Mother told Grandparents that, to accommodate a change in the Christmas plans of Stepfather's family, Bella would need to be returned to Mother at 2:00 p.m. instead of at 3:00 p.m. A quarrel ensued between Mother and Grandmother in Bella's

-4-

presence. Bella became upset. Ultimately, Mother allowed Grandmother to take Bella, and Grandmother returned Bella to Mother at 2:00 p.m., as requested.

The next day, on Monday, December 26, 2011, Grandfather sent Mother a text message requesting a visit with Bella on Wednesday of that week.[6] In response, Mother sent Grandfather a text message declining the request, stating that Bella would not be coming back over to their house for visits because of Grandmother's resistance to Mother's Christmas Day request to pick the child up early. In the text exchange, Mother said that her lawyer would be contacting Grandparents' lawyer.[7]

In January 2012, after Bella's school Christmas vacation ended, Grandparents went to visit Bella at her school to have breakfast with her. Grandparents learned at that time that they had been removed from the list of approved school visitors, so they were not permitted to see Bella on that occasion. After this incident, Grandparents made no attempt to contact Bella by telephone or otherwise, nor did they attempt to contact Mother to request a visit.

Meanwhile, Mother filed her answer to Grandparents' petition for visitation. She denied all allegations in their petition and asked the trial court to dismiss it. Father filed an answer as well; he did not oppose Grandparents' petition for court-ordered visitation "so long as it does not negatively affect his residential time with his child."

On May 31, 2012, the trial court conducted the trial on Grandparents' petition for court-ordered visitation. Father was not present but was represented by counsel. At trial, Father took the same position he had taken in his answer, that he did not oppose visitation by Grandparents but did not want any court-ordered visitation for Grandparents to impinge on his parenting time with Bella. The trial court heard testimony from Grandparents and from Mother.

Grandfather was the first to testify. He said that he worked as a firefighter, and that Grandmother worked as a school bus driver. He testified that he and Grandmother had a close, loving relationship with Bella, and that for years Mother permitted them to visit with Bella anytime they asked. Referring to a calendar kept by Grandmother, Grandfather said that they saw Bella three or four times each week. He said that Bella attended all of their

---

[6]This exchange of text messages between the parties was described by the witnesses in testimony at trial, but the appellate record does not include a transcript of the messages.

[7]The testimony is unclear, but apparently Mother texted that there would be no extra visitation beyond what a judge ordered her to do; Mother later explained that she said this to Grandparents because they "threatened several times to take [her] to court."

family functions and went with them on numerous out-of-town vacations. Several times they all celebrated Bella's birthday together at Grandparents' house, with Grandparents providing most of the party supplies.

Grandfather testified that, once Bella came of school age, he and Grandmother attended all of her school activities and programs: "[W]hatever was going on, we'd be involved in it." Sometimes they took Bella to school or picked her up, sometimes they visited her for lunch, and sometimes they attended services with Bella at the church affiliated with the school. All told, Grandfather said, during the Fall 2011 semester, he and Grandmother visited Bella at school 19 times.

After Father made the referral to DCS, Grandfather testified, the Grandparents' relationship with Mother began to deteriorate. He said that Mother cut their time with Bella "back to like two or three hours." Grandfather testified about his text exchange with Mother after Christmas 2011, and also about the discovery that he and Grandmother had been taken off the list of approved visitors for Bella's school. Grandfather stated that, subsequently, he and Grandmother never called Mother to request a visit with Bella, nor did they attempt to call the child on the telephone; they had not seen or spoken to Bella since December 26, 2011. Grandfather asserted that Bella is very attached to Grandparents, and that they wanted court-ordered visitation with her because she is part of their family. Counsel for Grandparents asked Grandfather, "You just want what your son would have if he was here?" Grandfather replied, "Right."

Grandmother corroborated Grandfather's testimony regarding their involvement in Bella's life. She said that Mother had permitted them to have Bella virtually anytime they wanted. Bella came to their house at least three nights a week, they picked her up from school, and kept her when Mother was out of town. Grandmother described hosting Bella's birthday parties and other holidays and said that she and Grandfather included Mother's family in the celebrations.

Grandmother acknowledged in her testimony that she called Father in October 2011 to report what she perceived as inappropriate behavior by Bella. Like Grandfather, she attributed the breakdown in her relationship with Mother to Father's referral to DCS. Grandmother claimed that she would not have called DCS under those circumstances. After the DCS referral, Grandmother said, Mother "was just real short with me, and trying to give me stipulations." Grandmother claimed that, after the DCS referral, she saw the child only once a week. She conceded that Bella was still permitted "some overnight" visits with Grandparents, "but not much."

Grandmother testified about the disagreement with Mother on Christmas Day 2011, shortly after Mother was served with their lawsuit. She claimed that Mother wanted Bella returned an hour early from Grandparents' Christmas Day visit simply because she changed her mind. Grandmother described her response to Mother's request: "All I said was, I'll see you in court. That's all I said." Perhaps not surprisingly, Grandmother said that Mother then "started screaming and telling us we couldn't have her at all." Upset at the scene, Bella started crying. Grandmother said that Mother "tried to jerk Bella out of the car," but then relented and let Grandparents take Bella to have Christmas dinner with them.

Grandmother agreed with Grandfather's testimony that she and Grandfather had not called to visit or talk with Bella since the Christmas incident. She confirmed that they had made no attempt to see the child since January 2012, when they learned they had been removed from the approved visitors' list at Bella's school. Grandmother explained that they had not done so because they did not want to see the child hurt.

As to the statutory element of substantial harm under the grandparent visitation statute, the Grandparents' attorney asked Grandmother, "Do you think it will cause substantial harm to [the child] if that relationship [between Grandmother and the child] is terminated or limited in any way?" Grandmother answered, "Yes, ma'am." Grandmother testified that Father was planning to move back to Tennessee, and conceded that any court-ordered visitation rights for Grandparents should not supercede his visitation rights.

Mother also testified at trial. She agreed that Grandparents have had a significant relationship with Bella since she was four months old, and she agreed that they had been very involved in the child's life. She disputed somewhat Grandparents' testimony on the frequency of the child's visits, but agreed that Bella had typically visited with Grandparents at least once during the week and overnight on Saturday nights, with more during summer months. Until the recent problems arose, Mother said, she never denied Grandparents' requests for visitation, and Grandparents helped her with Bella whenever needed. She acknowledged that Bella had shared her birthday, holidays, and vacations with Grandparents.

Mother testified about the events that led her to limit Grandparents' visits with Bella. Mother said that, when her younger daughter fell and fractured her skull, the children were removed from her custody for 72 hours. At that point, Grandparents had nothing to do with DCS's decision to investigate. Subsequently, however, Grandmother told Father about Bella's supposed inappropriate behavior, and Father called DCS. Mother agreed that her decision to limit Grandparents' time with Bella occurred after that. She claimed, however, that Father's DCS referral did not motivate her to limit Grandparents' visitation. Rather, she asserted that, when the younger daughter fractured her skull, she and Stepfather decided that they "want[ed] to draw closer as a family together and we want[ed] to be able to do things

with our children that we haven't been doing up until this point." Mother said that she explained to Grandparents that cutting back on their visits with Bella "had nothing to do with any other situation, other than we want to draw closer as a family," and told them that Bella could stay overnight with them on every other Saturday, rather than every Saturday. Mother testified that this arrangement was in place from November 2011 until Christmas 2011.

Mother's testimony about the confrontation with Grandmother on Christmas Day 2011 was generally consistent with Grandmother's version of the incident. Mother felt that it was reasonable for her to request that Grandparents have Bella back at 2:00 p.m. rather than 3:00 p.m. because Mother's family plans had changed on the "spur of the moment." Mother apparently misheard Grandmother's response as "I'll see you at four" instead of "I'll see you in court," and learned later what Grandmother had actually said. In any event, Mother became angry at Grandmother for resisting Mother's request to bring Bella back early. Despite this, Mother allowed Bella to go with Grandparents because it was Christmas and Bella was crying over the incident.

Mother testified about the text message exchange with Grandparents the next day. She admitted that she had texted them that Bella would not be going back to Grandparents' house. Until that day, Mother said, she had never denied Grandparents' visitation with Bella. She claimed that, had Grandparents contacted her after that day, she would have allowed them to see Bella, and she would have allowed them to talk to Bella had they called.

Mother testified that Bella loves Grandparents, and that, for the most part, they had been a positive influence in her life. Mother testified that she was not opposed to Grandparents having visitation with Bella. She thought that overnight visits with Grandparents every weekend would cause Bella to miss out on too many weekend activities with their nuclear family, and she believed that one overnight visit per month would be reasonable. Mother also did not object to Grandparents having some visitation with Bella on holidays and even allowing Bella to accompany Grandparents on vacations. Mother did not want Grandparents to be able to visit Bella at school, because they were visiting Bella there too often.

Mother said that, when Father transferred to Hawaii, she and Father came to an agreement about their parenting arrangement; at the time of trial, Father was speaking to Bella on the telephone on a weekly basis. Mother stated that she and Father had agreed they would adjust Father's residential parenting time to a more "normal" schedule when he moved back to Tennessee.

## Trial Court Decision

At the conclusion of the hearing, the trial court issued an oral ruling granting Grandparents' petition for court-ordered visitation pursuant to the Grandparent Visitation Statute. Without specifying the evidence on which it relied, the trial court held that "there was circumstantial evidence to establish that there was some opposition to visitation." It read aloud some of the provisions of the grandparent visitation statute with the necessary elements, namely, a significant existing relationship between the child and Grandparents for a period of 12 months or more immediately preceding the severance of the relationship, severance of the relationship for reasons other than abuse or danger to the child, and that the severance was likely to cause substantial harm to the child. It then concluded that these elements were met. The trial court held that the child's best interest would be served by ordering a visitation schedule for Grandparents so that, while Father was away, Bella would be able to "continue the relationship with the . . . paternal side of the family . . . ." It then outlined a detailed visitation schedule similar to the visitation schedule often ordered for a biological parent, even including court-ordered overnight visitation with the child on the Grandparents' birthdays.

On August 28, 2012, the trial court entered a written order incorporating some of the language in its oral ruling and setting out the specifics of Grandparent's visitation schedule. Again without reciting the evidence on which the trial court relied, the order set forth the factual finding that "there has been opposition to visitation and as such the petition is proper." The order also recited the factual finding that "severance of that relationship [between Bella and Grandparents] will cause significant harm to the child and cause severe emotional harm to the child." The order then set out the elaborate visitation schedule for Grandparents the trial judge had outlined in his oral ruling. The order essentially gave Grandparents the every-other-weekend visitation Father would have had if he exercised his own parenting time, and then set forth separate visitation rights for Grandparents even if Father moved to Tennessee and began exercising his own parenting time. In the event Father moved to Tennessee, the order stated, Grandparents would "then have visitation with the child for a forty[-eight] (48) hour period, one (1) time each month, and the Mother shall be allowed to designate[] that time." Grandparents were awarded summer and holiday visitation – again including an entire day on each of the Grandparents' birthdays – with the schedule dependent on whether Father exercised his parenting time.[8] Grandparents were also granted

---

[8]For summer visitation, Grandparents were granted residential time of one weekend per month (plus any fifth weekend), but they were to have one additional week of residential time with the child if Father did not exhaust his maximum of four weeks residential time with the child. For holidays, if Father did not exercise any of his holiday parenting time, then Grandparents would have the following:

(continued...)

residential time with the child during the child's fall and spring breaks "if the Father does not exercise his Fall and/or Spring break with the child." The trial court also ordered that Grandparents be permitted to visit with the child at school one day per week, so long as it did "not interfere with the Mother or [the] education process." Finally, the trial court ordered that Grandparents be permitted two fifteen-minute telephone calls with the child each week. The August 28, 2012 order was made *nunc pro tunc* on the date of the hearing, May 31, 2012. From this order, Mother now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Mother raises several issues on appeal:

1. Whether the trial court erred in applying the Grandparent Visitation Statute, Section 36-6-306, based solely on the finding that there was "circumstantial evidence to establish that there was some opposition to visitation"?

2. Whether grandparent visitation should have been denied because Grandparents failed to prove that severance of their relationship with the child would likely or actually occasion a substantial emotional harm to the child?

3. Whether the trial court erred in failing to give sufficient weight to Mother's preferences regarding the child's time with Grandparents?

4. Whether the trial court's grant of grandparent visitation time in the approximate amount of the alternate residential parent's visitation time is excessive and/or unreasonable, and/or is not in the child's best interest?

5. Whether the trial court incorrectly considered photographs not admitted into evidence?

6. Whether the trial court erred in entering its August 28, 2012 order *nunc pro tunc*?

---

[8](...continued)
Six (6) hours on the child's birthday
Six (6) hours on Father's day
Four (4) hours on Easter
Six (6) hours on Thanksgiving
Each of the grandparents' birthdays from 10:00 a.m. on the day of their birthday until 10:00 a.m. the following day.

Because this case was tried by the court sitting without a jury, we review the case *de novo* on the record, presuming the trial court's findings of fact to be correct unless the evidence preponderates otherwise. *Angel v. Nixon*, No. M2010-00554-COA-R3-CV, 2010 WL 4483915, at *2 (Tenn. Ct. App. Nov. 8, 2010); Tenn. R. App. P. 13(d). To preponderate against a trial court's finding of fact, the evidence must support another finding of fact with greater convincing effect. *Angel*, 2010 WL 4483915, at *2; *see also Mosley v. McCanless*, 207 S.W.3d 247, 251 (Tenn. Ct. App. 2006); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review *de novo* the trial court's determinations on questions of law, and its application of law to the facts, with no presumption of correctness in the trial court's decision. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We review *de novo* the trial court's construction of a statute as a question of law. *Smallwood v. Mann*, 205 S.W.3d 358, 361 (Tenn. 2006).

## ANALYSIS

Mother first argues that the trial court erred in concluding that the Grandparent Visitation Statute applies in this case. On appeal, as in the trial court below, Mother does not dispute that Grandparents had a "substantial relationship" with the child within the meaning of the Grandparent Visitation Statute. She contends, however, that there was no proof that she opposed Grandparents' visitation with the child, no proof that she had severed or terminated their relationship with the child, and no proof that Bella would suffer substantial emotional harm if the relationship were severed or terminated.

On opposition to visitation, Mother points out that the testimony at trial established that she did not oppose visitation prior to the filing of the petition in this matter, and that she denied Grandparents' request for visitation only one time – on December 26, 2011 – after the petition was filed, when she referred Grandparents to her lawyer. This, she claims, does not constitute "opposition" under the statute, particularly when Grandparents made no further attempt to contact the child. Furthermore, she notes, the testimony at trial demonstrated that she does not oppose Bella's visitation with Grandparents, within reasonable limits. Therefore, she argues, in the absence of opposition to Grandparents' visitation, the Grandparent Visitation Statute does not apply.

In addition, Mother contends on appeal that the trial court erred in finding that Grandparents' relationship with Bella was severed or that the child would suffer severe emotional harm if it were. The only testimony on this statutory element, Mother notes, was Grandmother's affirmative answer when asked if Bella would suffer emotional harm if her relationship with Grandparents was "terminated *or limited in any way*." Thus, Mother maintains, there is no evidence in the record establishing severe emotional harm to the child if the relationship were severed or terminated.

-11-

In response, Grandparents contend that the trial court correctly held that the Grandparent Visitation Statute is applicable. On the element of opposition to visitation, the Grandparents argue that they had become accustomed to liberal visitation with Bella, and that Mother's restriction of their visitation in November 2011 amounted to opposition to visitation. Grandparents argue that "the frequency and conditions imposed by Mother, when compared to the visitation enjoyed by Grandparents for the first five years of the minor child's life . . ., certainly equates to a denial of visitation as early as November 2011." They contend that Mother then unequivocally opposed visitation on December 26, 2011, by sending Grandfather a text message stating that Bella "won't come back over there," referring to Grandparents' house. Mother's opposition was further demonstrated, Grandparents insist, by her act of removing Grandparents from the list of approved visitors at Bella's school. After December 25, 2011, Grandparents argue, "Mother did not offer any further visitation with Grandparents despite her self-serving statement at trial that she never opposed the Grandparents visitation and would have allowed visitation had they asked."

Grandparents argue that Mother in fact severed their relationship with the child on December 26, 2011, when she texted that Bella would not come back over to their house, and when she removed them from the list of approved visitors for Bella's school. As proof of severe emotional harm to the child from severance of the relationship, Grandparents point to the fact that Bella cried when put in the custody of the maternal grandmother during the DCS investigation, the fact that the child cried during the Christmas Day argument between Mother and Grandmother, and Mother's concession that the child was "at times" upset at not seeing Grandparents. They contend that they were only required to show the likelihood of severe emotional harm, and that this standard was met. Therefore, Grandparents claim, the trial court was correct in applying the Grandparent Visitation Statute in this case and in awarding them liberal visitation.

As set forth below, after careful review of the record, we conclude that the position taken by Grandparents in the trial court below, and in this appeal, reflects a basic misunderstanding of the circumstances in which grandparent visitation may be ordered by a court and a fundamental misapplication of Tennessee's Grandparent Visitation Statute in several important respects. Unfortunately, the trial court adopted the approach advocated by the Grandparents in this case, so we are left with no choice but to reverse.

As this Court has explained, an understanding of the importance of a parent's fundamental right to raise a child as the parent sees fit is foundational to any discussion of grandparent visitation:

> Some background on grandparent visitation is helpful. The decisions of the
> U.S. Supreme Court and the Tennessee Supreme Court, interpreting the federal

and state constitutions, explicitly prohibit any judicial assumption that grandparent/grandchild relationships always benefit the child, as contrary to the parents' fundamental right to raise their children as they see fit. *See Troxel v. Granville*, 530 U.S. 57, 66-72, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000) (recognizing parents' fundamental constitutional right to make decisions on care, custody and control of children, finding trial court erred in presuming grandparent visits are in best interest of children); *Hawk v. Hawk*, 855 S.W.2d 573, 577-82 (Tenn. 1993) (recognizing parents' fundamental constitutional right, finding trial court engaged in "sentimental" commentary on grandparents and erred in "unquestioning judicial assumption" that grandparent-grandchild relationship always benefits child, basing award of grandparent visitation on that presumed benefit). To avoid such an assumption, the Tennessee constitution and Tennessee's grandparent visitation statute require a grandparent seeking visitation to prove, as a threshold requirement, that the child will be in danger of substantial harm if visitation is not ordered by the court. *Hawk*, 855 S.W.2d at 581; Tenn. Code Ann. § 36-6-306(b)(1). Both the federal constitution and Tennessee's grandparent visitation statute require the petitioning grandparent to show that visitation was opposed or denied in order for the court to consider ordering visitation. *Troxel*, 530 U.S. at 71 (trial court erred in giving no weight to fact that parent had assented to some grandparent visitation under certain conditions); *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *7-8 (Tenn. Ct. App. Oct. 22, 2008) (in light of parents' fundamental right, Tennessee grandparent visitation statute "is not implicated" unless visitation is denied or opposed). Under *Troxel*, pursuant to the federal constitution, in all phases of a proceeding on grandparent visitation, there is a presumption that a fit parent is acting in the child's best interest, and the court must accord special weight to the parent's determinations. *Troxel*, 530 U.S. at 68, 70 (plurality opinion) ("there is a presumption that fit parents act in the best interests of their children.") (if a fit parent's decision on grandparent visitation "becomes subjected to judicial review, the court must accord at least some special weight to the parent's own determination.").

*Green v. Evans*, No. M2011-00276-COA-R3-CV, 2012 WL 1107887, at *8 (Tenn. Ct. App. Mar. 30, 2012). Thus, "[g]randparent visitation statutes must be narrowly construed in order to comport with the state and federal constitutions, because they are in derogation of the parents' fundamental constitutional rights." *Spears v. Weatherall,* 385 S.W.3d 547, 550 (Tenn. Ct. App. 2012) (quoting *Lovlace v. Copley*, M2011-00170-COA-R3-CV, 2012 WL 368221, at *21 (Tenn. Ct. App. Feb. 3, 2012) (Kirby, J., concurring in part and dissenting in part), *perm. app. granted* (Tenn. June 21, 2012)).

The Grandparents in this case appear to be operating under the misguided assumption that, because Mother had permitted them to have generous visitation with the child for several years, they are entitled to continue such a level of visitation, and that they are basically entitled to stand in the shoes of their son, who chose to live far from his daughter. Unfortunately, this faulty premise appears to have been embraced by the trial court, which ordered a level of visitation that would be appropriate for a biological parent, to the point of even ordering visits with the Grandparents on each of their birthdays.[9] In a grandparent visitation case, the trial court may not "start with the standard for an action between a child's parents as the baseline and 'tweak' it . . . for . . . grandparent visitation." *Lovlace*, 2012 WL 368221, at *22 (concurring and dissenting opinion). Treating a dispute between a grandparent and a parent in a manner similar to a dispute between two parents disrespects the parent's fundamental constitutional rights:

> [T]he two situations are fundamentally different, as emphasized by our Supreme Court in *Smallwood v. Mann*, 205 S.W.3d 358 (Tenn. 2006). A grandparent visitation action "is not a contest between equals." *Stacy v. Ross*, 798 So. 2d 1275, 1280 (Miss. 2001); *Smallwood*, 205 S.W.3d at 361-63. As stated by the Maryland appellate court:
>
> > In a situation in which both parents seek custody, each parent proceeds in possession, so to speak, of a constitutionally-protected fundamental parental right.
> >
> > * * *
> >
> > Where the dispute is between a fit parent and a private third party, however, both parties do not begin on equal footing. . . . The parent is asserting a fundamental constitutional right. The third party is not.
>
> *McDermott v. Dougherty*, 869 A.2d 751, 770 (Md. 2005), *abrogated on grounds not affecting quoted excerpt by In re Ta'Niya C.*, 8 A.3d 745, 755-57 (Md. 2010), and *In re Rashawn*, 937 A.2d 177, 194 (Md. 2007). This principle should be the baseline starting point for any discussion of the

---

[9]Even in a case in which court-ordered grandparent visitation is warranted, "[t]he grandparents are entitled only to an amount of visitation sufficient to avert the danger of substantial harm to the child, and only for so long as such visitation is necessary to avoid the danger of substantial harm." *Lovlace,* 2012 WL 368221, at *25 (concurring and dissenting opinion).

standard in a grandparent visitation case. It should remain paramount in every part of the analysis of [an action for] grandparents' visitation. . . .

*Lovlace*, 2012 WL 368221, at *22-23 (concurring and dissenting opinion); *see also Green*, 2012 WL 1107887, at 10 n.15 ("We note that grandparent visitation disputes are not comparable to visitation disputes between parents.") (citing *Smallwood*, 205 S.W.3d at 361-63).

Indeed, our Supreme Court has held that a trial court may not simply "assign" an absent parent's visitation rights to the grandparents. In *Smallwood*, the child was born to unwed parents. *Smallwood*, 205 S.W.3d at 360. The father enlisted in military service and was often away. In an action brought by the paternal grandmother, the trial court entered an order permitting the paternal grandparents to exercise the father's visitation rights when he was away. *Id.* at 360-61. The mother appealed. On appeal, the *Smallwood* Court held that there was no statutory authority for such an award, and that it "constitutes an infringement on the fundamental rights of parents to raise their children as they see fit." *Id.* at 363 (citing *Hawk*, 855 S.W.2d at 581).

In the case at bar, the trial court went even further, ordering separate visitation for Grandparents *even if* Father is available and exercises his own residential parenting time.[10] This Court has held that, where the noncustodial parent can exercise his own visitation rights, we do not even reach the issue of whether the grandparent visitation statute is applicable, because the grandparents (the parents of the noncustodial parent) may see the child via their son or daughter, and their request for court-ordered grandparent visitation is mooted. *See Keisling v. Keisling*, 196 S.W.3d 703, 725 (Tenn. Ct App. 2005).[11]

With these concepts in mind, we consider whether the trial court erred in holding that the Grandparent Visitation Statute applies in this case and in granting court-ordered visitation to Grandparents. Tennessee's Grandparent Visitation Statute provides in pertinent part:

> (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction or juvenile court in matters involving children

---

[10]Hence, Father's emphasis in the trial court and on appeal that he did not oppose Grandparents' visitation with Bella so long as their visitation did not interfere with his own.

[11]There are significant factual differences between *Keisling* and the instant case; in *Keisling*, the mother lived with the maternal grandmother who sought court-ordered visitation, while Father in this case lives some distance from Mother and the child. For that reason, we exercise our discretion not to rely on the doctrine of mootness in this case.

-15-

born out of wedlock of the county in which the petitioned child currently resides, necessitates a hearing *if such grandparent visitation is opposed by the custodial parent* or parents:

> (1) The father or mother of an unmarried minor child is deceased;
>
> (2) The child's father or mother are divorced, legally separated, or were never married to each other;
>
> (3) The child's father or mother has been missing for not less than six (6) months;
>
> (4) The court of another state has ordered grandparent visitation;
>
> (5) The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent or parents (this grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child); or
>
> (6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately *preceding severance of the relationship, this relationship was severed by the parent or parents for reasons other than abuse or presence of a danger of substantial harm to the child,* and severance of this relationship is likely to occasion substantial emotional harm to the child.

Tenn. Code Ann. § 36-6-306(a) (emphasis added). As the emphasized portions of the statute indicate, the Grandparent Visitation Statute is not even implicated unless the grandparent can establish that visitation was opposed by the custodial parent before the petition for grandparent visitation was filed.

The caselaw on grandparent visitation emphasizes that the Grandparent Visitation Statute "cannot not be used by grandparents who think they are entitled to more or different visitation in the absence of a finding that the parents actually or effectively 'opposed' visitation." **See Huls v. Alford**, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at \*8 (Tenn. Ct. App. Oct. 22, 2008). Grandparents in the instant case bore the burden of proving,

-16-

as a threshold matter, that Mother, as the custodial parent, "opposed" their visitation. The trial court found that Grandparents had met this burden, but did not identify the facts on which this holding was based.

The facts in the record do not support the trial court's finding. First, as noted above, Father indicated consistently that he does not oppose Grandparents' visitation with Bella. As to Mother, prior to November 2011, Mother had permitted Grandparents liberal visitation with Bella, allowing them to see the child a few times during the week and to have at least one overnight visit with her on weekends. It is undisputed that, in November 2011, Mother limited Grandparents' weekly visits to about once each week, and she reduced overnight visits to one night every other weekend. Apparently outraged by Mother's decision, Grandparents' response was to hire a lawyer and file a lawsuit against both Mother and Father.

Grandparents note that opposition to visitation may be found even "when visitation is technically not opposed, but where the frequency and/or conditions imposed by the parents on the visitation are such that it equates to a denial of visitation." *Id.* They contend that, prior to the filing of their lawsuit, Mother's reduction in the generous visitation they once enjoyed, coupled with what Grandmother characterized as "stipulations" on the visits, amounted to a denial of visitation.

The Grandparents' argument on this issue is sheer hubris. This Court has previously held that reasonable limitations on grandparent visitation "cannot be considered opposition to visitation." *Green,* 2012 WL 1107887, at *10. The visitation Mother described to Grandparents in November 2011, once a week plus overnight every other weekend, remained generous by any measure and amounted to no more than placing reasonable limits on the visits.[12] The undisputed evidence shows that, prior to the filing of the Grandparents' petition, Mother had not, by word or deed, indicated that she opposed Grandparents' visitation with Bella. Thus, at the time the Grandparents filed their lawsuit seeking court-ordered visitation, there had been no "opposition to visitation" within the meaning of the Grandparent Visitation Statute.

---

[12]Much was made at trial about the reason for Mother's decision to limit Grandparents' visits, whether it was motivated by a desire for the child to spend more time with her nuclear family in the wake of Mother's marriage to Stepfather, as Mother claimed, or whether it was motivated by ill feelings toward Grandparents caused by Father's referral to DCS. Regardless of Mother's reason for placing limitations on Grandparents' visits, "the State, in the form of the trial judge, must resist the urge to become 'super-parent;' as noted in *Troxel*, because the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a better decision could be made." *Lovlace,* 2012 WL 368221, at *27 (concurring and dissenting opinion) (citing *Troxel*, 530 U.S. at 72-73, 120 S. Ct. at 2064 (internal quotations omitted)).

Grandparents argue that, after their petition was filed, Mother opposed their visitation because, on Christmas Day 2011, she restricted their five-hour visit to four hours, she argued with Grandmother about returning Bella early from the visit, and she completely denied their request to visit with the child on the Wednesday after Christmas. They also point to Mother's December 26, 2011 text message to Grandfather that Bella would no longer be coming to their house and that, if they wanted visitation, they would need to speak to Mother's lawyer, and to Mother's act of removing them from the list of approved visitors to Bella's school.

In the absence of evidence that Mother opposed Grandparents' visitation prior to the filing of Grandparents' petition for court-ordered visitation, this is unavailing. Grandparents cite no authority showing that they may establish the threshold element of opposition to visitation by relying solely on events that occurred *after* they filed their lawsuit seeking court-ordered visitation. If the custodial parent did not oppose grandparent visitation before the petition for court-ordered grandparent visitation is filed, evidence of the custodial parent's conduct *after* the petition is filed cannot establish the threshold element of opposition.

The events in this case show how wrongheaded it would be to interpret the Grandparent Visitation Statute to permit the petitioning grandparent to establish opposition based solely on events that occur after the petition is filed. Prior to the filing of Grandparents' petition, the facts show that parties had a cooperative relationship. Mother had demonstrated that she wanted to keep Grandparents as a presence, albeit reduced, in Bella's life. In November and December 2011, Grandparents had enjoyed multiple visits with Bella, including overnight visits, and Mother had gone so far as to agree to allow Bella to attend a family function with Grandparents for several hours on Christmas Day.[13] Instead of accepting Mother's decision as her prerogative as Bella's parent, the Grandparents chose to make the situation adversarial by filing a lawsuit against Mother and against their own son.[14] Even Mother's response to

---

[13] According to the dissent, Grandparents "previously had visitation with the child several times during the week, every week, and at least one night every weekend, and then, suddenly, they had none." Respectfully, this is not accurate. Prior to the filing of the Grandparents' petition, Mother only *reduced* Grandparents' visitation schedule, and Mother's reduced visitation allowance was still generous, giving Grandparents visitation at least once during each week and an overnight visit every other weekend.

[14] For Grandparents to respond to Mother's reduction of their visits by embroiling the family in litigation is at odds with their repeated assertions that they sought only to act in Bella's best interest. The United States Supreme Court has recognized the deleterious effect of grandparent visitation litigation on a child and her parents. *See Troxel,* 503 U.S. at 75 (noting that "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent. . .become[s] implicated' "), *quoted in Lovlace,* 2012 WL 368221, at *27 (concurring and dissenting opinion); *see also Green*, 2012 WL 1107887, at *11 (noting that petitioning grandparent had "demonstrated a propensity for keeping the family under the constant burden of litigation" and dismissing the petition for

(continued...)

Grandparents' service of a lawsuit on her — two days before Christmas — was remarkably restrained; instead of cancelling the planned visit, she still permitted Grandparents to take Bella for the planned Christmas Day visit. Mother told Grandmother only that she needed Bella to return an hour early to accommodate her husband's family. By her own admission, Grandmother responded to Mother's rather mild request with still more provocation: "*I'll see you in court.*" Unsurprisingly, Mother then angrily referred Grandparents to her lawyer. As illustrated by the events in this case, it would be ironic indeed if grandparents could create an adversarial situation where none had existed, and then turn around and use the parent's reaction to the grandparents' pugnacity in order to establish the parent's opposition to the grandparents' visitation and secure court-ordered visitation. We decline to interpret the Grandparent Visitation Statute in this fashion.

The dissent says that *Angel v. Nixon*, *supra*, is inconsistent with our holding herein. In our view, however, neither the facts nor the analysis in *Angel* are inconsistent with our opinion. In *Angel*, the father of the child at issue came from a very close-knit extended family. He and the child regularly attended family gatherings in the paternal grandmother's home, and the child developed a very close relationship with the paternal grandmother. *Angel*, 2010 WL 4483915, at *1. Tragically, the father died. Following the father's death, the relationship between the mother of the child and the paternal grandmother became strained. The mother and the child moved in with the mother's relatives, and the paternal grandmother did not see the child. The only in-person contact between the child and the paternal grandmother came about by happenstance, when "one afternoon, [the m]other noticed [the paternal g]randmother's car at a local grocery store and stopped by with the child so [the paternal g]randmother could see him briefly." *Id.* When the paternal grandmother sued the mother for the return of several items of the deceased father's property, their relationship became "openly hostile." *Id.* After this, neither the mother nor the grandmother felt comfortable with each other; the appellate court noted that the two women "communicated over the phone occasionally, but Grandmother did not see the child." *Id.*

At that point, after having not seen the child at all, aside from the chance meeting in the grocery-store parking lot, the paternal grandmother in *Angel* filed a petition for grandparent visitation. Pending trial, the mother allowed the paternal grandmother "restricted and supervised visitation with the child" on only three occasions, thirty minutes per visit, at the mother's home under the supervision of the Mother or her relatives." *Id.* at *2. At trial, the mother claimed that she did not oppose visitation for the paternal grandmother. The trial court rejected this assertion as "absolutely untruthful" and found that the mother had, in fact, opposed visitation. *Id.* at *1 (quoting trial court decision). After finding a significant

---

[14](...continued)
court-ordered visitation).

relationship and severe emotional harm, the trial court awarded the paternal grandmother three hours of visitation on every third Sunday of the month. *Id.* at \*2.

On appeal in *Angel*, the mother challenged the trial court's finding that she opposed visitation, and pointed to the three visits that occurred during the pendency of the proceedings. In its analysis on opposition to visitation, the appellate court first noted that the trial court based its finding of opposition "on the uncontroverted facts that [the paternal grandmother] only visited the child one time — in the parking lot of a grocery store — in the time between [the father's] death and the filing of this petition, and that [the mother] notified [the paternal grandmother] to cease all contact with [the mother] or face a restraining order." *Id.* at \*3. Therefore, in *Angel*, the mother's pre-petition conduct, preventing the grandmother from seeing the child *at all* before the petition was filed, except for the single chance meeting in the grocery store parking lot, clearly met the standard in *Huls*, which states that, regardless of whether the custodial parent admits opposition to visitation, it nevertheless can be found if "the frequency and/or conditions imposed by the parents on the visitation are such that it equates to a denial of visitation." *Huls*, 2008 WL 4682219, at \*8. The *Angel* Court then went on to review the mother's actions after the grandmother filed her petition. *Angel,* 2010 WL 4483915, at \*3. Thus, the *Angel* Court was not faced with a situation in which the custodial parent did not oppose the grandparent's visitation prior to the filing of the grandparent's petition for court-ordered visitation, and the petitioning grandparent sought to establish opposition based solely on the parent's conduct after the petition was filed.

In contrast to the facts in *Angel*, in the case at bar, prior to the filing of Grandparents' petition, Mother allowed Bella to have weekly visitation, every-other-week overnight visits, and agreed to a visit of several hours on Christmas Day, a schedule that in no way amounts to a "technical denial" of visitation.[15] *Angel* is fully consistent with our holding above, that post-petition conduct by the custodial parent can be utilized only to *bolster* or *contradict* a showing that the custodial parent opposed visitation prior to the filing of the petition; it cannot be used as a *substitute* for evidence that establishes opposition prior to the petition.[16]

---

[15] In fact, the visitation to which Mother agreed prior to the filing of Grandparents' petition was far more than the once-a-month visitation that the *Angel* court awarded to the paternal grandmother in that case. *See Angel*, 2010 WL 4483915, at \*2.

[16] For this reason, we must respectfully disagree with the dissent's assertion that opposition to visitation can be established solely through evidence of events that took place *after* the Grandparents filed their petition; we do not see how the claims in the petition can be based on events that have not yet occurred. Likewise, we are puzzled by the dissent's assertion that our analysis amounts to a holding that the grandparents should have dismissed their lawsuit and re-filed to assert Mother's denial of visitation, and derides this as a "mockery of judicial economy." Our position, however, is not that the Grandparents should have dismissed

(continued...)

Thus, we must conclude that the undisputed evidence in the record preponderates against the trial court's conclusion that the Grandparents had carried their burden of demonstrating that Mother opposed Grandparents' visitation with Bella. Because Grandparents did not establish the threshold fact that Mother opposed their visitation before Grandparents filed the petition for court-ordered visitation, we must conclude that the Grandparent Visitation Statute is inapplicable in this case.

For the same reasons, we also conclude that a preponderance of the evidence does not support the trial court's factual finding that Grandparents' relationship with Bella was "severed," as is required for application of subsection (a)(6) of Tennessee's Grandparent Visitation Statute.[17] *See* Tenn. Code Ann. §36-6-306(a)(6). As discussed above, their relationship with the child was not severed before the petition for visitation was filed; Mother merely placed reasonable limitations on Grandparents' visits, well within her purview as a fit parent. Grandparents' sharp disappointment at the reduction in their visits does not transform Mother's decision into a severance of the relationship within the meaning of the statute.

Thus, we hold that Grandparents did not make the threshold showing that Mother opposed their visitation with the child prior to the filing of the petition, nor did they establish that the relationship was severed prior to the filing of Grandparents' petition. Accordingly, the Grandparent Visitation Statute is not applicable. Consequently, we need not reach the issue of whether the evidence submitted at trial preponderates in favor of a finding that there was a danger that Bella would suffer severe emotional harm from the severance of her relationship with Grandparents. *See* Tenn. Code Ann. § 36-6-306(a)(6); *see also Huls*, 2008 WL 4682219, at *7-8 (concluding that, in light of the parents' fundamental right, the Tennessee Grandparent Visitation Statute "is not implicated" unless visitation is denied or opposed).

For all of these reasons, we conclude that the trial court erred in holding that Grandparents had met the threshold requirement of opposition under the Grandparent Visitation Statute, and in finding that Grandparents' relationship with the child was severed prior to the filing of the petition for visitation. Because the Grandparent Visitation Statute was not implicated under the facts of this case, the trial court's order establishing a visitation schedule for

---

[16](...continued)
and re-filed their petition for court-ordered visitation; it is that their petition should never have been filed to begin with.

[17]Grandparents argued in the trial court that Mother had severed their relationship with Bella and that this severance was likely to cause substantial harm to the child. The trial court found that the Grandparents had proven severance of the relationship and severe emotional harm.

Grandparents must be reversed, and the Grandparents' petition must be dismissed with prejudice.

Mother and Grandparents both request attorney fees incurred in this appeal. As Grandparents did not prevail in the appeal, we reject their request for appellate attorney fees. Because Mother has not stated a basis for an award of appellate attorney fees, other than appealing to the discretion of the Court, we deny her request as well. All other issues raised on appeal are pretermitted.

## CONCLUSION

The decision of the trial court is reversed, and the petition of Appellees Kimberly Lou Uselton and Terry Twayne Uselton is dismissed in its entirety with prejudice. Costs on appeal are assessed against Appellees Kimberly Lou Uselton and Terry Twayne Uselton, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE